UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RAMON BRAVO,<br><br>           Petitioner,<br><br>    v.<br><br>STU SHERMAN,<br><br>           Respondent. | No. 2:15-cv-0812 KJN P<br><br>ORDER & FINDINGS & <u>RECOMMENDATIONS</u> |

I. <u>Introduction</u>

Petitioner is a state prisoner, proceeding through counsel, with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. Petitioner challenges his 2012 conviction for attempted murder (Cal. Penal Code §§ 664/187(a)), discharge of a firearm from a motor vehicle (Cal. Penal Code § 12034(c)), and committing these offenses for the benefit of a criminal street gang (Cal. Penal Code § 186.22(b)(1), (f)). Petitioner is serving a sentence of thirty-two years to life.

Petitioner raises two claims: 1) insufficient evidence to support his attempted murder conviction; and 2) insufficient evidence to support his conviction for discharge of a firearm from a motor vehicle. After carefully considering the record, the undersigned recommends that the petition be denied.

////

1

II. Standards for a Writ of Habeas Corpus

An application for a writ of habeas corpus by a person in custody under a judgment of a state court can be granted only for violations of the Constitution or laws of the United States. 28 U.S.C. § 2254(a). A federal writ is not available for alleged error in the interpretation or application of state law. See Wilson v. Corcoran, 562 U.S. 1, 4 (2010); Estelle v. McGuire, 502 U.S. 62, 67-68 (1991).

Title 28 U.S.C. § 2254(d) sets forth the following standards for granting federal habeas corpus relief:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim -
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

For purposes of applying § 2254(d)(1), "clearly established federal law" consists of holdings of the United States Supreme Court at the time of the last reasoned state court decision. Thompson v. Runnels, 705 F.3d 1089, 1096 (9th Cir. 2013) (citing Greene v. Fisher, 132 S. Ct. 38 (2011); Stanley v. Cullen, 633 F.3d 852, 859 (9th Cir. 2011) (citing Williams v. Taylor, 529 U.S. 362, 405-06 (2000)). Circuit court precedent "may be persuasive in determining what law is clearly established and whether a state court applied that law unreasonably." Stanley, 633 F.3d at 859 (quoting Maxwell v. Roe, 606 F.3d 561, 567 (9th Cir. 2010)). However, circuit precedent may not be "used to refine or sharpen a general principle of Supreme Court jurisprudence into a specific legal rule that th[e] [Supreme] Court has not announced." Marshall v. Rodgers, 569 U.S. 58, 64 (2013) (citing Parker v. Matthews, 132 S. Ct. 2148, 2155 (2012) (*per curiam*)). Nor may it be used to "determine whether a particular rule of law is so widely accepted among the Federal Circuits that it would, if presented to th[e] [Supreme] Court, be accepted as correct. Id. Further,

where courts of appeals have diverged in their treatment of an issue, it cannot be said that there is "clearly established Federal law" governing that issue. Carey v. Musladin, 549 U.S. 70, 77 (2006).

A state court decision is "contrary to" clearly established federal law if it applies a rule contradicting a holding of the Supreme Court or reaches a result different from Supreme Court precedent on "materially indistinguishable" facts. Price v. Vincent, 538 U.S. 634, 640 (2003). "[R]eview under 28 U.S.C. § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits." Cullen v. Pinholster, 563 U.S. 170, 181 (2011).

Under the "unreasonable application" clause of § 2254(d)(1), a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from the Supreme Court's decisions, but unreasonably applies that principle to the facts of the prisoner's case.[1] Lockyer v. Andrade, 538 U.S. 63, 75 (2003); Williams, 529 U.S. at 413; Chia v. Cambra, 360 F.3d 997, 1002 (9th Cir. 2004). In this regard, a federal habeas court "may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Williams, 529 U.S. at 412. See also Schriro v. Landrigan, 550 U.S. 465, 473 (2007); Lockyer, 538 U.S. at 75 (it is "not enough that a federal habeas court, in its independent review of the legal question, is left with a 'firm conviction' that the state court was 'erroneous.'"). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." Harrington v. Richter, 562 U.S. 86, 101 (2011) (quoting Yarborough v. Alvarado, 541 U.S. 652, 664 (2004)). Accordingly, "[a]s a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded

---

[1] Under § 2254(d)(2), a state court decision based on a factual determination is not to be overturned on factual grounds unless it is "objectively unreasonable in light of the evidence presented in the state court proceeding." Stanley, 633 F.3d at 859 (quoting Davis v. Woodford, 384 F.3d 628, 638 (9th Cir. 2004)).

3

disagreement." Richter, 562 U.S. at 102.

If the state court's decision does not meet the criteria set forth in § 2254(d), a reviewing court must conduct a de novo review of a habeas petitioner's claims. Delgadillo v. Woodford, 527 F.3d 919, 925 (9th Cir. 2008); see also Frantz v. Hazey, 533 F.3d 724, 735 (9th Cir. 2008) (*en banc*) ("[I]t is now clear both that we may not grant habeas relief simply because of § 2254(d)(1) error and that, if there is such error, we must decide the habeas petition by considering de novo the constitutional issues raised.").

The court looks to the last reasoned state court decision as the basis for the state court judgment. Stanley, 633 F.3d at 859; Robinson v. Ignacio, 360 F.3d 1044, 1055 (9th Cir. 2004). If the last reasoned state court decision adopts or substantially incorporates the reasoning from a previous state court decision, this court may consider both decisions to ascertain the reasoning of the last decision. Edwards v. Lamarque, 475 F.3d 1121, 1126 (9th Cir. 2007) (en banc). "When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." Richter, 562 U.S. at 99. This presumption may be overcome by a showing "there is reason to think some other explanation for the state court's decision is more likely." Id. at 99-100 (citing Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991)). Similarly, when a state court decision on a petitioner's claims rejects some claims but does not expressly address a federal claim, a federal habeas court must presume, subject to rebuttal, that the federal claim was adjudicated on the merits. Johnson v. Williams, 133 S. Ct. 1088, 1091 (2013).

Where the state court reaches a decision on the merits but provides no reasoning to support its conclusion, a federal habeas court independently reviews the record to determine whether habeas corpus relief is available under § 2254(d). Stanley, 633 F.3d at 860; Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003). "Independent review of the record is not de novo review of the constitutional issue, but rather, the only method by which we can determine whether a silent state court decision is objectively unreasonable." Himes, 336 F.3d at 853. Where no reasoned decision is available, the habeas petitioner still has the burden of "showing there was no

reasonable basis for the state court to deny relief." Richter, 562 U.S. at 98.

A summary denial is presumed to be a denial on the merits of the petitioner's claims. Stancle v. Clay, 692 F.3d 948, 957 & n.3 (9th Cir. 2012). While the federal court cannot analyze just what the state court did when it issued a summary denial, the federal court must review the state court record to determine whether there was any reasonable basis for the state court to deny relief. Richter, 562 U.S. at 98. This court "must determine what arguments or theories . . . could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme] Court." Id. at 102. The petitioner bears "the burden to demonstrate that 'there was no reasonable basis for the state court to deny relief.'" Walker v. Martel, 709 F.3d 925, 939 (9th Cir. 2013) (quoting Richter, 562 U.S. at 98).

When it is clear, however, that a state court has not reached the merits of a petitioner's claim, the deferential standard set forth in 28 U.S.C. § 2254(d) does not apply and a federal habeas court must review the claim de novo. Stanley, 633 F.3d at 860; Reynoso v. Giurbino, 462 F.3d 1099, 1109 (9th Cir. 2006).

In the instant action, the California Court of Appeal is the last state court to issue a reasoned decision addressing petitioner's claims. (See Respondent's Lodged Documents 6, 8.) Accordingly, pursuant to 28 U.S.C. § 2244(d), the undersigned gives deference to the opinion of the California Court of Appeal.

III. Factual Background

The opinion of the California Court of Appeal contains a factual summary. After independently reviewing the record, the undersigned finds this summary to be accurate and adopts it herein.

> The Victim's Testimony
>
> On the morning of April 3, 2010, Juan Alvarado, a member of the Norteño gang, started walking from his girlfriend's house on Taft Street to his father's home on Berggren Street, about five blocks away. As Alvarado turned onto Berggren Street, a car drove up, stopped, and Alvarado was shot by the man in the front passenger seat. Alvarado was hit once in the abdomen, sustaining life-threatening injuries. Defendant was the driver. The passengers

5

were: Gerardo Villasenor, Narciso Guzman, and Roberto Padilla. The occupants of the car were members of the Sureño gang.

At trial, Alvarado testified he was walking with his head down "half asleep" when he heard a screeching sound, as if someone driving a car was slamming on the brakes. He then heard a gunshot, looked up, and saw heads in the car. Alvarado was walking north, while the car traveled south on Taft Street. The car took off after he was shot.

Alvarado initially denied knowing who shot him, but later identified Villasenor (codefendant) as the shooter. [Footnote 3] Codefendant was about 25 feet from Alvarado when he was shot. [Footnote 4.] Alvarado attended sixth and seventh grades with codefendant, and knew codefendant's brother. As a Norteño, he was not supposed to snitch against others, even members of a rival gang like the Sureños.

> [Footnote 3: Villasenor is not a party to this appeal.]

> [Footnote 4: Before Alvarado admitted codefendant shot him, he testified the car was 40 feet away when he was shot.]

A police officer responding to the incident found Alvarado in the backyard of a nearby residence. Among the items worn by Alvarado were a red belt with the letter "N" on the buckle and black and red shoes. Alvarado said he was walking outside when he was shot, and then jumped over a fence and told the home's resident to call the police. Alvarado identified the car as a late 1990's gold, four-door Oldsmobile. He said there were five Hispanic guys in the car, all members of the Sureño gang. Alvarado would not further identify them, which was common in gang shootings.

Alvarado was later interviewed by police at the hospital. He told the officer he was walking north on Taft Street at the corner of Berggren Street, when a car traveling south on Taft turned left on Berggren. Someone on the passenger side shot him. The car was about 12 feet away from Alvarado when he was shot. The car's occupants were from the Howe Park Sureño gang.

Alvarado identified codefendant as the shooter in a photographic lineup. Alvarado told the officer he thought he went to middle school with codefendant, and had beaten up codefendant's older brother and the boyfriend of codefendant's sister when he was in the ninth grade.

Guzman's Testimony

In April 2010, Narciso Guzman lived with his parents in Sacramento, having moved there from Orange County about 10 years earlier. He was friends with Sureño gang members in Orange County, and joined the Sureños within a few years of moving to Sacramento. He was a friend of codefendant, whom he referred to by the nickname "Lalo," and knew defendant by the nickname

6

"Charlie Brown." He admitted Howe Park Sureños often carried guns.

On the day of the incident, Guzman was picked up in the Arden area by defendant, who was driving an Oldsmobile Alero. Guzman sat in the rear passenger seat, while defendant drove and codefendant sat in the front passenger seat. Padilla sat behind defendant. At 7:12 a.m., they stopped at a liquor store at the intersection of Marysville Boulevard and Del Paso Boulevard, where Guzman bought beer.

After buying beer, defendant drove to the "wrong side of the neighborhood" instead of to Guzman's neighborhood to drop Guzman off at his home. Codefendant spotted a person he recognized, and defendant pulled over at the intersection of Taft and Berggren Streets. The car was in the center of the street at the intersection. Guzman could not recall why defendant stopped the car, and did not remember seeing the person wearing anything red. However, he believed that after the incident, codefendant mentioned going to school with the person. Guzman believed the man was a "Northerner."

Both before and after the shooting, no one in the car spoke. Guzman was "mean mugging" [Footnote 5] the man on the street, and he believed codefendant was doing the same. Codefendant stuck a gun out of the window and fired three or four shots at the man. Defendant then made a u-turn at normal speed and drove back to Del Paso Boulevard in the direction of Marysville Boulevard. They stopped at the home of "Shaggy," another gang member, where they socialized before Shaggy drove Guzman home. It took five to ten minutes to drive from the scene of the shooting to Shaggy's home.

[Footnote 5: A term for giving somebody a dirty look.]

Guzman was surprised when codefendant started shooting, and defendant looked shocked when the shots were fired. They never talked about going to look for Northerners. They only discussed getting some beer and going home. Later in his testimony, Guzman admitted he did not see whether defendant looked at the victim or had a look of shock on his face.

In an interview with police, Guzman said he was picked up at his house by defendant and codefendant on the day of the shooting. They cruised around and got some beer. Codefendant saw a Norteño and shot three to four times at him. Afterward, defendant dropped Guzman off at a store and he walked home.

Other Evidence

Alejandro Buraga lived on Berggren Way in April 2010. He was having breakfast with his family on April 3, 2010, at around 8:00 a.m., when he heard three to four popping sounds, like fireworks. He went outside and saw a Hispanic man running fast and a speeding car. The man ran west on Berggren Street and then south

7

> on Taft Street. The car, a white two-door, followed the man.
>
> A Sacramento Police detective testified as an expert on Hispanic gangs. Alvarado was a validated member of the Norteños, a gang associated with the color red. The rival Sureños were associated with the color blue. Shooting at a rival gang member benefits the gang by showing the gang is not afraid of the rival or to use guns. Gang members are taught to carry a gun and to be aware of their surroundings at all times. Snitching is disapproved, and can lead to being killed, beaten, or ostracized if kept alive.
>
> Codefendant was a validated Howe Park Sureño with the gang name Lalo. Guzman and Padilla were validated Howe Park Sureños and defendant was a validated Sureño.
>
> The expert found the shooting benefitted the Howe Park Sureños by demonstrating they were unafraid of the rival Norteños, were willing to use guns, and were trying to reduce the membership of a rival gang. A crime like this would elevate the status of the shooter and the driver within the gang.

People v. Bravo, 2013 WL 5825250 at *1-3 (Cal. App. 2013).

IV. Discussion

    A. Legal Standard for Claim Alleging Insufficient Evidence

The Due Process Clause of the Fourteenth Amendment protects a criminal defendant from conviction "except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." In re Winship, 397 U.S. 358, 364 (1970). Thus, a state prisoner who alleges that the evidence introduced at trial was insufficient to support the jury's findings states a cognizable federal habeas claim. Herrera v. Collins, 506 U.S. 390, 401–02 (1993). The prisoner, however, "faces a heavy burden when challenging the sufficiency of the evidence used to obtain a state conviction on federal due process grounds." Juan H. v. Allen, 408 F.3d 1262, 1274 (9th Cir. 2005). On direct review, a state court must determine whether "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). Federal habeas relief is available only if the state court determination that the evidence was sufficient to support a conviction was an "objectively unreasonable" application of Jackson. Juan H., 408 F.3d at 1275 n.13.

Habeas claims based upon alleged insufficient evidence therefore "face a high bar in federal habeas proceedings because they are subject to two layers of judicial deference."

Coleman v. Johnson, 566 U.S. 650, 651 (2012) (per curiam). As noted by the Supreme Court:

> First, on direct appeal, "it is the responsibility of the jury—not the court—to decide what conclusions should be drawn from evidence admitted at trial. A reviewing court may set aside the jury's verdict on the ground of insufficient evidence only if no rational trier of fact could have agreed with the jury." And second, on habeas review, "a federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court. The federal court instead may do so only if the state court decision was 'objectively unreasonable.'"

Id. (citations omitted).

The Jackson standard "must be applied with explicit reference to the substantive elements of the criminal offense as defined by state law." Jackson, 443 U.S. at 324 n.16. In performing a Jackson analysis, a jury's credibility determinations are "entitled to near-total deference." Bruce v. Terhune, 376 F.3d 950, 957 (9th Cir. 2004). When the factual record supports conflicting inferences, the federal court must presume that the trier of fact resolved the conflicts in favor of the prosecution, and must defer to that resolution. Jackson, 443 U.S. at 326.

B. Claim 1: Alleged Insufficient Evidence to Support Attempted Murder Conviction

*Reasoning of California Court of Appeal*

The California Court of Appeal denied claim 1 for the reasons stated herein:

> Defendant contends there is insufficient evidence to convict him of attempted murder as an aider and abettor. We disagree.
>
> The elements of aider and abettor liability are established upon proof a person, "acting with (1) knowledge of the unlawful purpose of the perpetrator and (2) the intent or purpose of committing, encouraging, or facilitating the commission of the offense, (3) by act or advice aids, promotes, encourages or instigates, the commission of the crime." (People v. Beeman (1984) 35 Cal.3d 547, 561.)
>
> "To be guilty of a crime as an aider and abettor, a person must 'aid[ ] the [direct] perpetrator by acts or encourage[ ] him [or her] by words or gestures.' [Citations.] In addition, except under the natural-and-probable-consequences doctrine [citation], ... the person must give such aid or encouragement 'with knowledge of the criminal purpose of the [direct] perpetrator and with an intent or purpose either of committing, or of encouraging or facilitating commission of,' the crime in question. [Citations.] When the crime at issue requires a specific intent, in order to be guilty as an aider and abettor the person 'must share the specific intent of the [direct]

9

perpetrator,' that is to say, the person must 'know[ ] the full extent of the [direct] perpetrator's criminal purpose and [must] give[ ] aid or encouragement with the intent or purpose of facilitating the [direct] perpetrator's commission of the crime.' [Citation.] Thus, to be guilty of attempted murder as an aider and abettor, a person must give aid or encouragement with knowledge of the direct perpetrator's intent to kill and with the purpose of facilitating the direct perpetrator's accomplishment of the intended killing—which means that the person guilty of attempted murder as an aider and abettor must intend to kill. [Citation.]" (People v. Lee (2003) 31 Cal.4th 613, 623–624.)

In this case, the jury was not instructed on the natural and probable consequences doctrine. Therefore, the People had to prove defendant had the intent to kill. Defendant argues there was no evidence he intended to kill Alvarado. He claims there was no evidence of a plan to kill Norteño gang members because the group intended only to make a "beer run." Defendant asserts there was no evidence the other passengers in the car knew that codefendant had a gun and had a personal motive for killing Alvarado because Alvarado had beaten up codefendant's older brother. He further claims the manner of the shooting—defendant turning the car, slowing briefly, and then codefendant shooting—shows defendant had no advance warning. Finally, he contends the gang evidence did not support an inference of an intent to kill.

"To determine sufficiency of the evidence, we must inquire whether a rational trier of fact could find defendant guilty beyond a reasonable doubt. In this process we must view the evidence in the light most favorable to the judgment and presume in favor of the judgment the existence of every fact the trier of fact could reasonably deduce from the evidence. To be sufficient, evidence of each of the essential elements of the crime must be substantial and we must resolve the question of sufficiency in light of the record as a whole. [Citations.]" (People v. Johnson (1993) 6 Cal.4th 1, 38.)

The fact that neither defendant nor codefendant expressed an intent to kill is not unusual. Intent is a state of mind, which, in the absence of the defendant's own statements (i.e., direct evidence), must be established by circumstantial evidence from which intent can be inferred. (People v. Mincey (1992) 2 Cal.4th 408, 433.) Because the defendant is the only person who has actual knowledge of his or her intent, the element of intent is rarely susceptible of direct proof and usually must be inferred from circumstantial evidence. (People v. Falck (1997) 52 Cal.App.4th 287, 299.)

Here, there is circumstantial evidence to support an inference of defendant's intent to kill. Alvarado wore a red belt and red and black shoes as he walked down the street. These red items identified him as a member of the rival Norteño gang, thus providing defendant and codefendant with a motive for killing him—elevating their status in the Sureño gang. According to Guzman's testimony, defendant took a detour from their intended route when he drove to the area where codefendant identified and shot at Alvarado. Defendant then turned left and stopped in an

10

intersection. [Footnote 6.] His car was either 25 feet away (by Guzman's trial testimony) or 12 feet away (by Guzman's interview with the police) from Alvarado and situated so codefendant could point his gun out the passenger side window and fire three to four shots at him.

> [Footnote 6: Defendant's contention that he merely slowed rather than stopped is not supported by the record. Asked, "are you sure you stopped in the middle of the street after you made that left," Guzman replied, "Yes, ma'am." When the prosecutor asked if he was sure, Guzman said he was "[p]ositive." Guzman also testified defendant pulled the car over after codefendant saw a person he recognized, and could not recall why defendant stopped the car. Whether other parts of Guzman's and Alvarado's testimony indicate the car did not stop is irrelevant, because in reviewing the sufficiency of the evidence, "[w]e resolve neither credibility issues nor evidentiary conflicts; we look for substantial evidence. [Citation.]" (People v. Maury (2003) 30 Cal.4th 342, 403.)

From this evidence, the jury could reasonably infer defendant had the intent to kill. By driving a different route and slowing down or stopping at the intersection, defendant provided codefendant with the opportunity to shoot several times at a rival Norteño gang member from close range. By driving away from the scene of the shooting, defendant provided an escape. (People v. Lee (1987) 43 Cal.3d 666, 679 [firing gun at officers 15 to 20 feet away evidence of intent to kill]; People v. Campos (2007) 156 Cal.App.4th 1228, 1244 [stopping truck four to five feet from a car and firing nearly a dozen bullets into it constitutes "overwhelming evidence" of intent to kill a passenger]; People v. Villegas (2001) 92 Cal.App.4th 1217, 1224–1225 [firing six shots at the occupants of a truck from about 25 feet is substantial evidence of intent to kill].)

Defendant's reliance on Juan H. v. Allen (9th Cir.2005) 408 F.3d 1262 is misplaced. In Juan H., the juvenile court found the minor culpable of first degree murder and attempted murder, both on the theory of aiding and abetting, even though the minor had not said anything, made any gestures, or otherwise encouraged the perpetrator. (Id. at pp. 1266–1267, 1269.) The United States Court of Appeals for the Ninth Circuit reversed the federal district court's denial of a writ of habeas corpus because the evidentiary insufficiency violated the minor's federal due process rights. (Id. at pp. 1266, 1279.) The present case is distinguishable because the prosecution established more than defendant's presence in the car. As we have explained, defendant drove the car out of the way to get to the area where the victim was walking, slowed or stopped the car in the middle of the road enabling defendant to fire several shots at relatively close range, and drove away from the scene of the shooting. We conclude defendant's conviction for attempted murder as an aider and abettor is supported by substantial evidence.

(People v. Bravo, 2013 WL 5825250 at *3-5.

*Analysis*

As correctly stated by the California Court of Appeal, petitioner was found guilty of aiding and abetting attempted murder based on the theory that he shared the intent to kill with his co-defendant, the shooter. For the reasons stated herein, the undersigned finds that the California Court of Appeal's finding that there was sufficient evidence to support petitioner's attempted murder conviction was not an unreasonable application of clearly established Supreme Court authority.

As found by the California Court of Appeal, the jury was presented with sufficient evidence from which it could reasonably infer that petitioner had the intent to kill. First, the jury heard evidence indicating that the victim was shot based on gang rivalry. Sacramento Police Detective Krutz, a gang expert, testified that the victim was a validated Norteno gang member. (RT at 432.) Petitioner, his co-defendant, and the other two men in the car on April 3, 2010, were validated members of the Sureno gang. (Id. at 453, 467, 471, 472.) Detective Krutz testified that, in his opinion, the April 3, 2010 shooting benefited the Surenos because it showed that they were unafraid of their enemies, i.e., the Nortenos. (Id. at 473.) The shooting also increased respect for Surenos on the street. (Id.) The shooting would also increase the status of the shooter and the driver in the gang. (Id. at 473-74.)

The jury heard evidence from which it could reasonably find that petitioner and his co-defendant knew that the victim was a Norteno gang member. At the time of the shooting, the victim wore a red belt with the letter "N" on the belt buckle. (Id. at 204.) He also wore red and black shoes. (Id.) The color red is worn by Norteno members. (Id. at 446.)

Guzman testified that before the shooting, he saw that the victim was wearing a red belt or a red bandana. (Id. at 376.) Guzman testified that wearing a red belt is like wearing a flag, which demonstrated membership in the Norteno gang. (Id. at 336.) Guzman testified that before the shooting, he believed the victim was a Northerner. (Id. at 268.) From this evidence, a reasonable jury could find that, before the shooting, petitioner and his co-defendant also saw the victim's red clothing, indicating that he was a member of the Sureno gang.

////

The jury heard evidence from which it could reasonably find that petitioner drove the car in a manner that would facilitate his co-defendant's shooting of the victim. The victim told Detective Krutz that,

> he [the victim] was walking northbound on Taft, and that when he got to the corner of Berggren and Taft, he was – he saw a car come southbound on Taft and they did a U-turn turn, and as he made a right-hand turn on to Berggren, the car pulled in, made a left-hand turn on to Berggren so that the right side of the car was next to him, and then the passenger shot him.

(Id. at 431.)

Detective Krutz later clarified that when he testified U-turn, he meant to say left hand turn. (Id.) Based on this testimony, as well as the evidence discussed by the California Court of Appeal regarding the proximity of the car from the victim, a reasonable jury could find that petitioner facilitated the shooting by positioning the car so that his co-defendant could shoot the victim.

In the petition, petitioner makes the same arguments he had made in state court in support of the instant claim. The undersigned briefly addresses these arguments herein.

First, petitioner argues that the evidence did not reasonably support the conclusion that he knew or had reason to know that his co-defendant intended to shoot the victim. (ECF No. 1 at 15.) Petitioner argues that there was no evidence of a plan to hunt for rival gang members. (Id. at 18.) Petitioner argues that the undisputed testimony established that the car's occupants only plan prior to the shooting was to go on a beer run. (Id.) Citing Guzman's testimony, petitioner also argues that even after spotting the victim, no one said a word about going after him or shooting him. (Id.)

Even without evidence of an explicit plan to hunt for rival gang members, the evidence demonstrated that, after seeing a rival gang member, petitioner pulled the car over and positioned it so that his co-defendant was facing the victim. As discussed above, from this evidence, the jury could reasonably infer that petitioner attempted to facilitate the shooting of the victim. Moreover, the gang expert testified that the shooting of a Norteno would increase the status of petitioner and his co-defendant and their gang. Thus, the lack of evidence of an explicit plan to hunt rival gang

13

members does not demonstrate that there was insufficient evidence of petitioner's intent to aid and abet the shooting.

The undersigned also observes that Guzman testified that the plan that morning was to go to buy some beer and then he (Guzman) would be dropped off. (RT at 260.) Instead, Guzman testified that they (inexplicably) ended up "on the wrong side of the street, in the wrong side of the neighborhood, on the wrong side of the neighborhood." (Id.) In the brief filed in the California Court of Appeal, respondent persuasively argued that the jury could reasonably infer from this evidence that they were "out looking for trouble, with [petitioner] determining the route to be taken." (Respondent's Lodged Document 4 at 13.)

Second, petitioner argues that there was no evidence that anyone knew that petitioner's co-defendant had a gun. (ECF No. 1 at 18.) Petitioner argues that Guzman testified that he did not know that the co-defendant had a gun. (Id.) Petitioner argues that the gun was small (.22 caliber), which was easily concealed in a pocket. (Id.)

While there was no direct evidence showing that anyone knew that the co-defendant had a gun, Guzman testified that it was not uncommon for gang members to carry guns. (RT at 373.) Moreover, the evidence showed that petitioner positioned the car so that his co-defendant was closer to the victim. From this evidence, the jury could reasonably infer that petitioner knew that his co-defendant had a gun, and positioned the car to facilitate the shooting. The lack of direct evidence showing that anyone knew that the co-defendant had a gun does not demonstrate that there was insufficient evidence of petitioner's intent to aid and abet the shooting.

Third, petitioner argues that substantial evidence showed that the co-defendant shot the victim for personal reasons, rather than based on his gang affiliation. (ECF No. 1 at 19.) Petitioner argues that Guzman testified that after the shooting, the co-defendant stated that he knew the victim because they had gone to school together. (Id.) The victim also testified that he thought he was shot because he (the victim) had beaten up the co-defendant's brother in the past. (Id.)

////

////

14

Petitioner is correct that Guzman testified that, after the shooting, the co-defendant said that he went to school with the victim. (RT at 266.) The jury also heard a tape of an interview with the victim by Detective Krutz where he stated that the co-defendant "probably" shot him because the victim had fought his older brother in the past. (CT at 761.)

As discussed above, the jury heard evidence demonstrating that the co-defendant shot the victim based on his gang affiliation. Guzman testified that, prior to the shooting, he believed the victim was a Norteno. (RT at 268.) Detective Krutz testified that, in his expert opinion, the shooting was motivated by gang rivalry. (Id. at 473-74.) In addition, a review of the victim's testimony indicates that he was reluctant to testify for fear of being labeled a snitch. The evidence indicates that the victim's fear of being labeled a snitch motivated him not to describe the shooting as gang related.

For the reasons discussed above, the undersigned finds that the jury heard sufficient evidence from which it could reasonably find that the shooting was gang related, rather than motivated by personal reasons related solely to the co-defendant.

Fourth, petitioner argues that the manner in which the shooting took place showed that petitioner had no advance warning. (ECF No. 1 at 20.) Petitioner argues that the evidence shows that the shooting took place quickly. Petitioner argues that Guzman testified that the co-defendant started shooting as soon as the car stopped. (Id.)

While the shooting may have happened quickly, the jury heard evidence that petitioner positioned the car so that his co-defendant was closest to the victim. From this evidence, the jury could reasonably infer that petitioner positioned the car in order to facilitate the shooting of the victim. That the shooting took place quickly does not undermine the jury's finding that petitioner intended to aid and abet the shooting.[2]

Fifth, petitioner argues that the gang evidence did not prove petitioner's foreknowledge of the intended shooting. (Id. at 21.) Petitioner argues that the crime did not take place on rival

---

[2] Petitioner argues that Guzman testified that petitioner looked shocked right after the shooting. (RT at 324.) However, petitioner admits that Guzman later testified that he could not see whether petitioner looked shocked. (See id. at 382.)

15

gang turf.  (Id. at 22.)  Petitioner argues that the gang expert's opinion regarding the shooting was generic and conclusory, i.e., it benefited the Surenos because it showed they were not afraid to kill Nortenos.  (Id.)  Petitioner argues that none of this testimony established that the co-defendant had a vendetta against the victim of which petitioner should have been aware.  (Id.)

The undersigned has reviewed gang expert Detective Krutz's testimony and finds that a reasonable jury could have relied on his testimony to find that the shooting was gang related. Moreover, as discussed above, Guzman testified that he believed that the victim was a Noreno prior to the shooting.  The jury had sufficient evidence to find that petitioner intended to aid and abet a gang related shooting.

Finally, as he did in state court, petitioner cites Juan H. v. Allen, 408 F.3d 1262 (9th Cir. 2005) in support of his claim alleging insufficient evidence to support his attempted murder conviction.  For the reasons stated herein, the undersigned finds that the California Court of Appeal correctly distinguished Juan H. from the instant action.

In Juan H., the Ninth Circuit found that there was insufficient evidence to support the petitioner's first degree murder conviction.  In Juan H., the petitioner (who was fifteen years old at the time of the incident) and his brother lived in a trailer park with their family.  408 F.3d at 1266.  Petitioner and his brother were associated with the Surenos.  Id.  Luis Ramirez and Sylvester Magdelano, who also lived in the trailer park, associated with the Nortenos.  Id.

In the months leading up to the shooting, petitioner made gang gestures at Magdelano.  Id. On March 10, 1999, Magdelano told petitioner that the gang gestures were unwelcome and punched him in the face.  Id.

On March 24 1999, petitioner and his family were at home when someone fired at least two shots at their trailer.  Id.  The police responded but made no arrest.  Id.  About one-and-a-half hours later, Magdelano and Ramirez were walking through the trailer park and saw petitioner, his brother and their family standing outside.  Id.  Petitioner and his brother ran out of Magdelano's sight into the trailer park.  Id.  Petitioner's brother reappeared from between two trailers and approached Magdelano and Ramirez.  Id.  Petitioner followed his brother and stood behind him. Id. at 1267.  Petitioner's brother asked Magdelano and Ramirez if they were the ones who had

shot his trailer. Id. Ramirez said that he did not know what petitioner's brother was talking about. Id. Petitioner's brother then pulled a shotgun from his side and shot Ramirez, who died from the wounds. Id. Magdelano fell to the ground, heard a second shot, but was not hit. Id. During the shooting, the petitioner did not say anything, make any gestures or otherwise encourage his brother. Id. Petitioner's brother then ran to his car and drove away in flight. Id. Petitioner ran home to his family's trailer. Id.

The Ninth Circuit found that there was insufficient evidence to support petitioner's conviction for aiding and abetting first degree murder. The Ninth Circuit found that there was insufficient evidence that petitioner 1) knew that his brother planned to commit the murders; 2) specifically intended to encourage or facilitate his brother's unlawful conduct; and 3) affirmatively acted in a manner so as to aid, promote, encourage or instigate the murders. Id. at 1276.

In particular, the Ninth Circuit found that the evidence did not support the state court's conclusion that petitioner left the murder scene in common "flight" with his brother. Id. The evidence demonstrated that petitioner ran home after the shooting after his brother ran to his car and drove away. Id. The Ninth Circuit found that the previous incidents between petitioner and the victims did not create a sufficiently strong inference of motive to allow a reasonable trier of fact to conclude beyond a reasonable doubt that petitioner had reason to aid and abet first degree murder. Id. at 1278.

Next, the Ninth Circuit found no direct evidence that petitioner had any idea that his brother planned to assault or murder the victims. Id. That the petitioner stood behind his older brother after his family home had been attacked, even if he knew his brother was armed, did not permit the rational inference that he knew his brother would assault or murder the victims. Id.

Finally, the Ninth Circuit also observed that the petitioner did not do or say anything before, during or after the shootings, from which a reasonable factfinder could infer an intent or purpose to aid and abet in the murders. Id.

As noted by the California Court of Appeal, the facts of the instant case are distinguishable from Juan H. Most importantly, petitioner did not merely stand by and watch

17

someone else shoot the victim. Petitioner, in the instant case, positioned the car he was driving so that his co-defendant was closer to the victim, i.e., petitioner facilitated the shooting. Petitioner then drove the car away from the shooting, i.e., he fled with the shooter. In addition, the jury in in the instant case heard evidence from gang expert Krutz that the shooting benefited the Sureno gang. Petitioner and the other three car passengers were Sureno members. From this evidence, a reasonable fact finder could find that petitioner had the intent or purpose to aid and abet the shooting of the victim by his co-defendant.

For the reasons discussed above, the undersigned finds that the denial of this claim by the California Court of Appeal was not an unreasonable application of clearly established Supreme Court authority. Accordingly, this claim should be denied.

C. Claim 2: Alleged Insufficient Evidence to Support Conviction for Discharge of a Firearm from a Motor Vehicle

*Reasoning of the California Court of Appeal*

The California Court of Appeal denied this claim for the reasons stated herein:

> Defendant contends there is insufficient evidence to support his conviction as an aider and abettor for discharging a firearm from a motor vehicle. [Footnote 7 omitted.]
>
> Former section 12034, subdivision (c), provided: "Any person who willfully and maliciously discharges a firearm from a motor vehicle at another person other than an occupant of a motor vehicle is guilty of a felony punishable by imprisonment in state prison for three, five, or seven years." (Stats. 1987, ch. 1147, § 3, p. 4059.) Defendant asserts there is insufficient evidence he intended to facilitate a shooting because he did not know codefendant had a firearm. In support, defendant notes Guzman testified codefendant shot suddenly and without warning, defendant looked shocked when codefendant fired the handgun, no gang signs were thrown before the shooting, and no words were uttered before the shooting.
>
> Guzman's testimony that defendant had a look of shock on his face when codefendant fired is contradicted by his testimony that he did not see defendant's face when the gun was fired. As previously noted, we resolve this conflict in favor of the guilty verdict. While no gang signs were thrown, Alvarado wore the color associated with the rival Norteños, and Guzman told the police this led him to believe the victim was a Norteño. Although the driver and passengers in the car may not have discussed firearms, Guzman testified it was common for Howe Park Sureños to carry firearms. Also, Guzman's professed surprise at the shooting is not relevant to whether defendant, the driver, was surprised by the shooting.

> Defendant drove the car in a manner that provided codefendant with the opportunity to fire the gun at Alvarado from his window at comparatively close range. We conclude substantial evidence supports defendant's conviction as an aider and abettor for discharging a firearm from a motor vehicle.

People v. Bravo, 2013 WL 5825250 at *5.

*Analysis*

Petitioner's arguments in support of his claim alleging insufficient evidence to support his conviction for aiding and abetting the discharge of a firearm from a motor vehicle are the same arguments he made in support of his claim alleging insufficient evidence to support his attempted murder conviction. (See ECF No. 1 at 30-33.)

For the reasons stated in the section above discussing petitioner's claim alleging insufficient evidence to support his attempted murder conviction, the undersigned finds that the California Court of Appeal's denial of petitioner's claim alleging insufficient evidence to support his conviction for discharge of a firearm from a motor vehicle was not an unreasonable application of clearly established Supreme Court authority. Accordingly, this claim should be denied.

Accordingly, IT IS HEREBY ORDERED that the Clerk of the Court shall assign a district judge to this action; and

IT IS HEREBY RECOMMENDED that petitioner's application for a writ of habeas corpus be denied.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within fourteen days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." If petitioner files objections, he shall also address whether a certificate of appealability should issue and, if so, why and as to which issues. A certificate of appealability may issue under 28 U.S.C. § 2253 "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(3). Any response to the objections shall be served and filed within fourteen days after

service of the objections. The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

Dated: May 7, 2018

/s/ Kendall J. Newman
KENDALL J. NEWMAN
UNITED STATES MAGISTRATE JUDGE

Br812.157